# Exhibit 45, Part 7 of 15

Et andet eksempel på, at refusionsanmodningerne ikke kan lægges til grund, er aktiebesiddelser i Tryg A/S. I 2015 foretog Tryg udlodning og indeholdt i den forbindelse (korrekt) cirka 123 millioner kr. i udbytteskat. Efterfølgende er der med henvisning til ejerskab til aktier i Tryg A/S blevet anmodet om refusion af indeholdt udbytteskat på samlet ca. 151 millioner kr. Heraf har pensionsplanerne til-bagesøgt samlet ca. 136 millioner kr. Der er altså ansøgt om – og udbetalt – langt mere i refusion, end der har været indeholdt. Det siger sig selv, at der aldrig kan være krav om refusion af mere, end der har været indeholdt. Det bemærkes, at det jo langt fra er alle aktionærer, der er berettiget til refusion.

Der er med andre ord utvivlsomt svindlet med refusionsanmodningernes oplysninger om ejerskab til danske aktier.

(...)

### 2.3     Pensionsplanernes påståede set-up

Pensionsplanerne har i deres 5 indlæg og på kontormøderne forklaret deres set-up. Alle pensionspla-nerne har anvendt samme model i og vidt omfang handlet samme aktier på samme tidspunkter.

Som eksempel på det forklarede set-up kan anvendes den mindste af prøvesagerne – [pensionsplan A]. [Pensionsplan A] foretog ét påstået aktiekøb, nemlig 2.987.462 aktier i TDC A/S. Aktierne blev ifølge pensionsplanen erhvervet den 7. august 2014 for 153.406.173,70 kr.

Transaktionerne kan opsummeres som følger (...):

(...)

[Pensionsplan A] gør gældende (jf. (...)), at pensionsplanen den 7. august 2014 købte ca. 2,9 mio. aktier i TDC for ca. 153 mio. kr. [Pensionsplan A] foretog dette køb uden at have kapital og uden at have sikret finansiering på aftaletidspunktet.

Samme dag – den 7. august 2014 – fandt [Pensionsplan A] en medkontrahent (en forward counter-party), som var indstillet på at kurssikre en aktiepost på 2,9 mio. aktier i TDC til en kursværdi på ca. 153 mio. kr. Denne forward counterparty blev således lovet kursstigningerne på aktien, men skulle til gengæld dække eventuelle kursfald. Forward counterparty skulle nødvendigvis være *meget* sol-vent. Kurssving på f.eks. 10 % (ca. 15,3 mio. kr. i dette tilfælde) er ikke unormale (...), og denne aftalepart skulle dermed kunne bære meget betydelige tab. I det konkrete tilfælde faldt aktiekursen for TDC i aftalens løbetid, og forward counterparty realiserede et tab på ca. 16 mio. kr. (...).

Fem dage senere – den 12. august 2014 – udlånte [Pensionsplan A] de 2,9 mio. aktier. Låntageren indvilgede i at stille en kontant sikkerhed, der svarede *netop* til aktiekursen den 7. august 2014 (dvs. på købstidspunktet), selvom aktiekursen – bl.a. pga. en udlodning af 1,5 kr. pr. aktie – naturligvis havde ændret sig siden.

Låntageren stillede 153 mio. kr. til rådighed i rede penge for lån af aktierne. Låntager krævede ikke sikkerhedsstillelsen reguleret i forhold til dagsværdien af aktierne, selvom låneaftalen (GMSLA'en) standardmæssigt gav mulighed herfor (...). Sikkerhedsstillelsen svarede til 51,35 kr. pr. aktie, selvom aktiekursen den 12. august 2014 varierede mellem 47,67 kr. og 48,28 kr. (...). Cirka 3 kr. pr. aktie – eller i alt 9 mio. kr. – var dermed overkurs på tidspunktet for sikkerhedsstillelsens udbetaling.

Dagen efter – den 13. august 2014 – skulle [Pensionsplan A] betale sælger for aktierne for at få disse. Og pensionsplanen skulle levere aktierne til aktielåntager for at få den kontante sikkerhedsstillelse. Sikkerhedsstillelsen fra aktielåntager matchede købesummen, så transaktionerne gik lige op og blev ifølge pensionsplanerne gennemført.

Samme dag modtog [Pensionsplan A] nettoudbyttet på ca. 3,2 mio. kr.

Den 5. november 2014 afhændede [Pensionsplan A] aktieposten for ca. 134 mio. kr. Forward-aftalen blev lukket til samme kurs, og aktielånet blev afviklet.

Den 12. november 2014 anmodede Syntax på vegne af [Pensionsplan A] om refusion af indeholdt udbytteskat. Anmodningen blev sendt til SKAT, att. Sven Nielsen. Vedlagt anmodningen var en udfyldt blanketansøgning, fuldmagt (Power of Attorney), Credit Advice udstedt af Old Park Lane og Form 6166 fra IRS.

Den 28. november 2014 fik pensionsplanen refunderet ca. 1,2 mio. kr. fra SKAT.

**2.4     Det påståede set-up ville aldrig kunne anvendes i virkeligheden**

Modellen hænger efter Skattestyrelsens vurdering ikke sammen. Det påståede set-up er simpelthen umuligt. Pensionsplanernes egen forklaring om, hvad der er sket, kan derfor ikke lægges til grund.

Som det fremgår, var [Pensionsplan A] afhængig af, at aftalerne flaskede sig fuldstændigt. Hvis ikke det skete, ville [Pensionsplan A] stå tilbage med risici, som pensionsplanen ubestridt ikke kunne bære.

[Pensionsplan A] skulle for det første finde en aktiesælger, der ville handle aktier for over 150 mio. kr. med en pensionsplan uden kapital og kreditværdighed og uden styr på finansiering på handelstidspunktet (aktierne blev jo først udlånt flere dage senere). Derudover skulle sælger være villig til på den ene side at give afkald på en eventuel kursgevinst opstået i perioden fra aftaleindgåelsen til settlement (idet en sådan kursstigning jo ville tilfalde pensionsplanen), mens sælger på den anden side skulle beholde risikoen for kursfald i samme periode, hvis pensionsplanen misligholdt købsaftalen (fordi pensionsplanen ikke havde nogen penge).

For det andet skulle [Pensionsplan A] samtidig finde en forward counterparty, der var i stand til at bære et meget betydeligt tab, idet et kursfald på f.eks. 10 % ville medføre et tab på 15,3 mio. kr. Denne forward counterparty skulle tro på, at aktiekurserne ville *stige*.

Derudover skulle [Pensionsplan A] for det tredje finde en aktielåntager, som havde 153 mio. kr. til rådighed i likvide midler. Denne aktielåntagers formål med aktielånet måtte nødvendigvis være shorting, hvis der skulle være et forretningsmæssigt rationale bag. Aktielåntageren skulle altså tro på, at aktiekurserne ville *falde*.

Tilmed skulle aktiesælger, forward medkontrahent og aktielåntager være indstillet på, at hele gevinsten – som præcist svarede til refusionen – gik til pensionsplanen.

Endelig var det nødvendigt, at custodian sikrede, at aktiekøbet og aktielånet blev gennemført samtidig. Ellers kunne pensionsplanen jo hverken betale for aktierne eller udlåne dem.

Det er *helt usandsynligt*, at hele denne kabale skulle kunne gå op for bare én pensionsplan for én aktiehandel.

Pensionsplanerne repræsenteret af TVC Advokatfirma gør imidlertid gældende, at ikke bare én, men mere end 100 uafhængige pensionsplaner har benyttet netop denne samme fremgangsmåde for utallige million- og milliardhandler. I vidt omfang på de samme dage og med de samme aktier.

Det er umuligt, at det har kunnet lade sig gøre i den virkelige verden. Pensionsplanernes omfattende bilagsmateriale dokumenterer ikke de påståede aktiehandler – tværtimod, jf. afsnit 3 og 5, nedenfor. Når bilagsmaterialet er så utroværdigt, som tilfældet er, bestyrker det jo handlernes fiktive karakter. Pensionsplanerne har således heller ikke bevist, at det har forholdt sig på den helt usandsynlige måde, som  de påstår.

Virkeligheden er, at pensionsplanernes historie alene er udtryk for bogføringsmæssige posteringer uden virkelige handler.

### 3.     INGEN PENGE ELLER KREDITVÆRDIGHED, MEN AKTIER FOR MILLIARDER

Det er ubestridt, at pensionsplanerne ikke selv havde penge til at finansiere de påståede massive opkøb af danske aktier. Aktierne kunne altså kun købes gennem ekstern finansiering.

Det er således et grundlæggende nødvendigt – men ikke tilstrækkeligt – moment i vurderingen af, om pensionsplanerne har løftet deres bevisbyrde for at have ejet de påståede aktier, om de har kunnet skaffe ekstern finansiering til køb af aktierne.

Ifølge TVC Advokatfirma havde de nystiftede pensionsplaner *"let"* adgang til finansiering af deres massive million- og milliardinvesteringer i danske aktier, (…).

Pensionsplanerne påstår med andre ord, at de kunne finansiere deres million- og milliardinvesteringer uden at skulle have én krone op af lommen og uden at skulle stille nogen form for sikkerhed.

Det passer jo ikke.

Det siger sig selv, at pensionsplanerne ikke kan finansiere købet af de påståede aktier uden at have hverken penge eller kreditværdighed.

Og når pensionsplanerne ikke har kunnet finansiere de påståede aktiekøb, kan pensionsplanerne heller ikke – i den virkelige verden – have købt aktierne.

### 3.1     Pensionsplanernes havde ikke nogen penge og har ikke modtaget nettoudbytter

Pensionsplanerne er "one-participant plans" (støttebilaget, afsnit 1.3), og det årlige indskud pr. deltager er således ifølge IRS' hjemmeside for 2016 begrænset til maksimalt $53.000 ($59.000 for deltagere, der er ældre end 55 år), (…). Der er ikke fremlagt dokumentation for, at der faktisk er foretaget sådanne indskud til pensionsplanen.

Pensionsplanerne var derudover *nystiftede¸* da de påbegyndte deres påståede meget massive investeringer i danske aktier.

Ingen af pensionsplanerne har indsendt Form 5500 til IRS, og det kan derfor lægges til grund, at de hver især havde aktiver på maksimalt $250.000 ved afslutningen af hvert regnskabsår (*plan year*), jf. støttebilaget, afsnit 1.3.

Alligevel påstår pensionsplanerne at have ejet aktier i danske C20-selskaber for meget store millionbeløb og i nogle tilfælde endda milliardbeløb (DKK).

Det forhold, at pensionsplanerne ikke har indsendt Form 5500 til IRS, hvorfor det må lægges til grund, at de hver især alene havde aktiver for maksimalt $250.000 ved udgangen af deres regnskabsår (*plan year*) understøtter ikke blot, at pensionsplanerne ikke havde et tilstrækkeligt kapitalgrundlag til at købe de massive påståede aktieposter, men *også*, at pensionsplanerne ikke har modtaget de påståede nettoudbytter.

I klageskrivelserne, s. 5, er det anført, at

> *"Det er ligeledes muligt at foretage udlodninger fra pensionskassen, med den virkning at aktiverne på regnskabsdagen var mindre end USD 250.000."*

På et møde den 13. december 2017 har IRS imidlertid oplyst SKAT, at hvis en pensionsplan udlodder midler, skal pensionsplanen indberette udlodningen til IRS på Form 1099-R (…) med angivelse af, hvor meget der er udbetalt og til hvem. Pensionsplanerne har ikke indleveret denne Form 1099-R til IRS.

Referat af SKATs møde med IRS den 13. december 2017 er fremlagt som (…).

Pensionsplanerne har heller ikke fremlagt dokumentation for udlodninger fra pensionsplanen. Grunden hertil er den simple, at pensionsplanerne ikke har modtaget de påståede nettoudbytter (og efterfølgende udloddet dem). Det skal understreges, at der er tale om pensionsplanernes eget dokumentationsmateriale, idet de påståede udlodninger skulle være sket fra dem selv. Alligevel fremlægger ingen af de over 100 pensionsplaner en sådan dokumentation.

Det anføres i TVC Advokatfirmas klageskrivelser, (…), at der kan være en lang række konkrete årsager til, at pensionsplanernes aktiver har oversteget grænseværdien på $250.000 (i forhold til pligten til at indsende Form 5500 til IRS) i løbet af året, mens aktiverne på sidste regnskabsår var mindre. I *intet* tilfælde redegøres der dog for, hvad der konkret har fået de enkelte pensionsplaners aktiver til at falde til under grænseværdien. Som *mulige* årsager nævnes, at gennemførte aktietransaktioner var gennemført på dette tidspunkt, at omkostninger i forbindelse med transaktioner reducerede aktiverne, og – som citeret ovenfor – at der kan være foretaget udlodninger fra pensionsplanerne.

Der fremlægges imidlertid ingen dokumentation herfor.

Det er stærkt underligt, at en part opstiller nogle muligheder for, hvordan han kan have handlet _uden_ at ville og kunne fortælle, hvad han *faktisk* har gjort. Dette understreger, at pensionsplaner søger og søger efter mulige forklaringer, der kan redde deres sag.

**3.2    Pensionsplanerne har ikke haft adgang til ekstern finansiering**

Pensionsplanerne gør gældende, at de har finansieret aktiekøbene ved at låne aktierne ud mod kontant sikkerhedsstillelse (…). Købsaftalen og låneaftalen er blevet gennemført (settlet) samtidig (…), og pengene fra aktielåntager er blevet anvendt til at betale for aktierne.

Forklaringen holder ikke. Der er ikke nogen, der vil indgå million-transaktioner – hverken handler eller aktielån – med en part, der ikke selv har nogen penge overhovedet.

De fremlagte bilag dokumenterer da heller ikke finansiering. Der er ingen pengestrømme, og aftaledokumenterne er utroværdige. I øvrigt er aftalerne end ikke på papiret blevet overholdt af pensionsplanerne:

### 3.2.1    GMSLA'erne er ikke troværdige

Pensionsplanerne har som (…) fremlagt en række GMSLA'er. Pensionsplanerne er i de fleste tilfælde *ikke* angivet i GMSLA'erne som aftalepart, og der er ikke redegjort for, hvordan disse aftaler relaterer sig til de enkelte pensionsplaner.

Medkontrahenterne ifølge GMSLA'erne er i alle tilfælde selskaber hjemmehørende i notoriske skattelylande og på samme adresser på henholdsvis Cayman Islands og British Virgin Islands.

De fremlagte GMSLA'er er i mange tilfælde ikke underskrevet af (alle) aftaleparter, og der er ikke truffet aftale om f.eks. valuta.

Endvidere er GMSLA'erne udaterede, hvilket understøtter, at de blot er konstrueret til lejligheden.

GMSLA'erne dokumenterer med andre ord på ingen måde, at pensionsplanerne derved havde mulighed for at skaffe tilstrækkelig likviditet til at finansiere de påståede aktieinvesteringer, og denne påståede tilførsel af likviditet er heller ikke dokumenteret ved kontoudtog.

I brev af 26. oktober 2017 har IRS endvidere oplyst SKAT følgende om pensionskassernes muligheder for at finansiere aktiekøb med lånte midler (…):

> *"[…] given the size or magnitude of the purported funds borrowed from a third party or GMSLA, these arrangements are <u>highly suspect</u>. A typical first-year, one- participant pension plan or one- participant plan in existence for two or even three years <u>would likely not have access to the millions of dollars required</u> to collateralize the GMSLA used in these transactions."* (mine understregninger).

Det er med andre ord ikke rigtigt, når pensionsplanerne påstår, at de til trods for deres beskedne egenkapital havde mulighed for at finansiere de påståede massive aktieinvesteringer.

Ifølge pensionsplanerne muliggjorde GMSLA'erne finansiering af aktiekøb ved samtidigt aktieudlån til tredjemand mod kontant sikkerhedsstillelse. Levering af aktier til pensionsplanerne skete samtidig med, at betaling skete fra pensionsplanerne ("Delivery Versus Payment"), (…). Dette er ganske enkelt ikke en praktisk mulighed af den simple grund, at pensionsplanerne ubestridt ikke havde nogen penge. Og der er ikke nogen, der laver hverken GMSLA'er eller OTC-handler med en part, som hverken har penge eller kreditværdighed. Det siger sig selv.

Af samme grund ville en aftalepart heller ikke tillade pensionsplanerne først at betale for aktierne efter købsdatoen, fordi der ikke er nogen sikkerhed for, at pensionsplanerne ville kunne opfylde sådanne aftaler.

### 3.2.2    Den påståede finansiering var ikke på plads på aftaletidspunktet

Om aktieudlånene anfører pensionsplanerne i (…), at aktielåntagerne ved konkrete aftaler forpligtede sig *"til at stille sikkerhed i form af kontanter svarende til aktiernes markedspris, på datoen hvor pensionsplanerne indgik aftalen om køb af aktierne."*

Det er altså pensionsplanernes forklaring, at aktieudlånsaftalerne altid blev indgået til samme kurs som de påståede aktiekøb.

Det er en helt usandsynlig fremgangsmåde. Hvis aktiekursen *falder* i perioden fra det påståede aktiekøb til aktieudlånets etablering, vil aktielåntager naturligvis kun stille sikkerhed i overensstemmelse

med den mindre kursværdi på aktieudlånstidspunktet. Derved vil pensionsplanerne ikke få den kontante sikkerhed, som er nødvendig for at betale for aktierne. Hvis aktiekursen omvendt *stiger*, vil pensionsplanerne naturligvis betinge sig sikkerhedsstillelse i overensstemmelse med denne kursstigning. Dette følger da også af "Marking-to-Market"-bestemmelsen i GMSLA'ens pkt. 5.4 (…).

I (…), anfører pensionsplanerne:

> *"Aktielånene blev desuden først etableret efter udbyttedatoen."*

I (…) uddybes dette:

> *"Aktierne blev betalt to henholdsvis tre dage efter købet ved at låne aktierne ud dagen efter udbyttedatoen og derved modtage en kontant sikkerhedsstillelse svarende til købsprisen for aktierne. De enkelte aktielån blev afviklet under rammeaftalen GMSLA, der var indgået forud for aktiehandlen."*

(…)

Derudover giver det ikke mening, at pensionsplanerne – uden egenkapital – skulle have indgået aftaler om aktiekøb for mange millioner kr. (og i nogle tilfælde milliarder kr.), for først at forsøge at skaffe finansiering ved aktieudlån flere dage senere. Det er helt usandsynligt, at aktiesælger ville tillade pensionsplanerne først at betale efter købsaftalens indgåelse ("Delivery Versus Payment", (…)), når pensionsplanerne på købstidspunktet ikke engang havde finansieringen på plads. Det er endvidere helt usandsynligt, at custodian ville indestå for en sådan *efterfølgende* finansiering.

### 3.2.3   Aktielånsaftalerne er "indgået baglæns"

Pensionsplanerne gør gældende, at de har finansieret aktiekøb gennem aktieudlån. Til belysning heraf har pensionsplanerne fremlagt bl.a. e-mails, som ifølge pensionsplanerne viser, hvordan aftalerne om aktielån er blevet indgået.

Pensionsplanerne har kun fremlagt eksempler på disse e-mailkorrespondancer, (…). Pensionsplanerne blev i (…) opfordret til at fremlægge *"al korrespondance om aktielån"*. Opfordringen er ikke besvaret.

(…)

### 3.2.4   GMSLA'erne er ikke blevet overholdt

I aktielånsaftalerne (GMSLA'erne) fremgår et vilkår om, at sikkerhedsstillelsen *dagligt* kan reguleres til markedskurs (…). Vilkåret kaldes "Marking-to-Market".

En sådan mulighed for daglig regulering af sikkerhedsstillelsen sikrer både aktielåntager og aktielångiver mod for store risici. Så længe sikkerhedsstillelsen svarer til aktiernes kursværdi, har både aktielåntager og aktielångiver nemlig fuld sikkerhed. Hvis låntager ikke tilbageleverer aktierne, har långiver penge, der kan bruges til at foretage erstatningskøb. Hvis långiver ikke tilbagebetaler sikkerhedsstillelsen, kan låntager afhænde aktierne og opnå fyldestgørelse gennem provenuet. Når aktiekursen ændrer sig, forsvinder denne balance. Hvis aktiekursen f.eks. stiger 10 %, har långiver ikke længere fuld sikkerhed for tilbagelevering af aktierne. Omvendt har låntager ikke fuld sikkerhed for tilbagebetaling af sikkerhedsstillelsen (dvs. pengene), hvis aktiekursen falder.

Vilkåret om "Marking-to-Market" er dermed centralt for at fastholde balancen mellem parterne og for at minimere parternes risici. Vilkåret giver nemlig mulighed for en løbende justering af sikkerhedsstillelsen, hvormed begge parter hele tiden har (næsten) fuld sikkerhed. Uafhængige parter vil selvfølgelig håndhæve et sådant vilkår løbende for ikke at stå tilbage med et usikret tilgodehavende.

Et eksempel på vilkårets betydning er [Pensionsplan A's] køb af TDC-aktier (…). Aktierne blev ifølge pensionsplanerne købt til kurs 51,35 den 7. august 2014 (inkl. udbytte på 1,5 kr. pr. aktie). Umiddelbart efter oplevede TDC-aktien et meget markant kursfald (…). Den 12. august 2014 var kursen mellem 47,67 kr. og 48,28 kr. Den 3. november 2014 var kursen mellem 44,95 og 45,41 kr. (…).

Aktielåntageren havde stillet kontant sikkerhed på 153.406.173,70 kr. den 12. august 2014. Allerede på det tidspunkt udgjorde aktiernes kursværdi (med dagens højeste kurs, 48,28 kr.) kun 144.234.665,36 kr. Dermed havde aktielåntageren et usikret tilgodehavende på mere end 9 mio. kr., som pensionsplanen ubestridt ikke havde midler til at dække.

Da aktielånet blev afviklet den 5. november 2014, var kursen 45 kr. pr. aktie, og kursværdien var dermed 134.435.790 kr. (…). Det usikrede tilgodehavende var på det tidspunkt 18.970.383,70 kr.

Som eksemplet viser, havde aktielåntager et *meget betydeligt* usikret tilgodehavende som følge af kursudviklingen. "Marking-to-Market"-klausulen i GMSLA'en havde til formål at afværge sådanne risici ved at foreskrive en løbende regulering af sikkerhedsstillelsen. Det havde været *oplagt* i et tilfælde som dette i overensstemmelse med den påberåbte GMSLA – at regulere sikkerheden i nedadgående retning, hvormed aktielåntager ikke havde haft et usikret tilgodehavende.

Det skete imidlertid ikke. Som det fremgår af (…), er der nemlig ikke bogført nogen betalinger ud fra "Marking-to-Market"-klausulen på noget tidspunkt forud for den 5. november 2014, hvor hele aktielånsaftalen blev afviklet.

Det betyder, at aktielåntager tilsyneladende accepterede at have et usikret tilgodehavende på mange millioner kroner fra den 12. august 2014 til den 5. november 2014. Det var på trods af, at tilgodehavendet var hos en pensionsplan, der ubestridt ikke havde nogen midler.

Når en daglig regulering (Marking-to-Market, (…)) ikke blev foretaget i nogen tilfælde, må det være fordi, det ikke var nødvendigt – fordi der ikke var nogen aktier og dermed ikke nogen risici.

TVC Advokatfirma anfører i (…), at GMSLA'ens pkt. 5.4 ikke finder anvendelse;

> *"Havde Skattestyrelsen læst bilag 1.3 til GMSLA, havde man set, at en sådan daglig regulering ikke var påkrævet, idet det ikke er pkt. 5.4, men derimod pkt. 5.5, der finder anvendelse."*

TVC Advokatfirmas udsagn er ganske uforståeligt og må bero på en forkert læsning af GMSLA'erne. Udsagnet er i hvert fald forkert. Henvisningen til *"bilag 1.3 til GMSLA"* er formentlig en henvisning til GMSLA'ernes "Schedule", pkt. 1.3.

I "Schedule" til GMSLA'erne fremgår følgende af pkt. 1.3, (…):

| 1.3 | Basis of Margin Maintenance: | |
|---|---|---|
| | Paragraph 5.4 (aggregation) shall not apply° | ☐ |
| | Paragraph 5.4 (aggregation) applies unless the box is ticked. | |

Som det fremgår, finder pkt. 5.4 anvendelse, medmindre boksen er tjekket af – hvilket den ikke er. Bestemmelsen i pkt. 5.4 om daglig regulering af sikkerhedsstillesen *fandt* derfor anvendelse.

### 3.2.5    Stock Lending Rate fastsættes arbitrært, og den aftalte Rate anvendes ikke (nyt)

Pensionsplanerne kan ikke forklare, hvilke forhold der har betydning for beregningen af den i custody statement (…) anførte stock lending fee, som angiveligt er blevet betalt i forbindelse med aktieudlånene.

I pensionsplanernes (…), anfører pensionsplanerne, at forholdet mellem aktielåntagerens og långiverens (dvs. pensionsplanen) "kapitalstyrke" har betydning ved forhandling af renten og aktielånsgebyret.

Det er ikke rigtigt, hvis pensionsplanerne ellers med deres udsagn mener, at gebyret fastsættes efter forhandlingsstyrken.

En gennemgang af de fremlagte custody statement (…) viser, at fastsættelsen af Stock Lending Rate ikke afhænger af, hvem der er aftalepart.

Som (…) fremlægges som eksempel en oversigt over pensionsplaner repræsenteret af TVC Advokatfirma, der i 2015 udlåner A.P. Møller Mærk A/S A-aktier, (…). Oversigten er udarbejdet med data fra pensionsplanernes fremlagte custody statements (…). Bilaget viser, at Stock Lending Rate er den samme for de pensionsplaner, der udlåner aktien i det samme antal dage, uanset hvem pensionsplanen udlåner aktien til.

Samme resultat ses ved <u>alle</u> transaktionerne for <u>alle</u> pensionsplanerne, der udlåner den samme aktie i samme periode.

Det er særdeles usandsynligt og fremstår konstrueret, at alle pensionsplaner indgår præcis den samme aftale med forskellige aftaleparter.

Det viser, at Stock Lending Rate *ikke* er fastsat ud fra parternes kapitalstyrke og ud fra en forhandling af renten. Derimod er Stock Lending Rate fastsat for at få transaktionerne til at gå i 0, jf. afsnit 4.5. Pensionsplanernes udsagn er altså objektivt forkert.

Dertil kommer en uoverensstemmelse ved [Pensionsplan B] udlån af 998.992 stk. Coloplast-aktier i 2014. [Pensionsplan B] aftalte i mailkorrespondance med aftaleparten (…) en "stock loan fee" på 36,47 basispoint, dvs. 0,3647 % (…). I henhold til custody statement (…) var Stock Lending Rate imidlertid 0,0173 %.

Det giver ikke mening, at der anvendes en anden Stock Lending Rate end den, der er aftalt mellem parterne. Det illustrerer, at parternes papiraftaler alene er lavet for syns skyld. Hvis der havde været

rigtige aktier og penge involveret, ville parterne selvfølgelig have reageret på, at låneomkostningerne afveg fra det aftalte.

**4.     UREALISTISK SET-UP UDEN FORRETNINGSMÆSSIGT RATIONALE**

Det er urealistisk, at pensionsplanernes påståede set-up skulle kunne finde sted i den virkelige verden. I dette afsnit ser Skattestyrelsen bort fra den helt karakteristiske, totale mangel på dokumentation, der præger alle pensionsplanernes sager.

Som beskrevet i afsnit 2.4, ovenfor, er der *alt* for mange parter involveret i transaktioner, der skal flaske sig på én helt bestemt måde. Det er *dybt* urealistisk, at det ville ske én eneste gang, hvis der var tale om rigtige aktier og penge mellem uafhængige parter. Pensionsplanerne *gør* imidlertid gældende, at det hele har flasket sig ved hver eneste aktiehandel for mere end 100 pensionsplaner. Det kan imidlertid kun lade sig gøre, hvis der ikke er penge eller aktier, og hvis parterne ikke er uafhængige.

Dertil kommer, at pensionsplanerne hver især har handlet aktieposter af en størrelse, som er helt ekstraordinær (afsnit 4.1, nedenfor). Selv hvis der bortses fra den manglende finansiering, er det tvivlsomt, om en enkelt pensionsplan ville kunne anskaffe sig så store aktieposter på én enkelt dag, eftersom handlerne hver især har et volumen, der er yderst unormalt på det danske aktiemarked. Det er indlysende, at *så mange* pensionsplaner ikke har kunnet købe *så store* aktieposter på samme dag. Det viser, at aktierne er fiktive.

Pensionsplanerne har derudover i *hvert enkelt* tilfælde angiveligt haft en arbitragegevinst, der er præcis lig med udbytterefusionen (når der bortses fra gebyrer til brokere mv.), jf. afsnit 4.2, nedenfor. Det er meget bemærkelsesværdigt, at tallene på den måde passer sammen – og det sker i *samtlige* pensionsplaners tilfælde for *samtlige* handler. Det betyder, at *alle* transaktionerne giver 0 som resultat, hvis der ses bort fra udbytterefusionen. Det ville jo ikke ske, hvis der foregik rigtige handler mellem uafhængige parter (afsnit 4.4, nedenfor).

En dybere analyse viser da også, at nulresultatet alene opnås, fordi en bestemt udgift (Stock Lending Fee) justeres til præcis den værdi, der gør, at det hele går i 0 (afsnit 4.5, nedenfor).

Endelig må det konstateres, at det under alle omstændigheder er utænkeligt, at de påståede medkontrahenter ville deltage i det set-up, pensionsplanerne har beskrevet, eftersom pensionsplanen oppebærer hele arbitragegevinsten uden at dele med de andre parter (afsnit 4.4).

En systematisk gennemgang af pensionsplanernes påståede setup og "dokumentation" viser således, at det er dybt urealistisk, at der skulle være foregået aktiehandler på den måde, som pensionsplanerne hævder og som bilagene ellers viser.

**4.1     Der er handlet urealistisk store aktieposter**

[Pensionsplan C] erhvervede angiveligt 6.267.033 B-aktier i Novo Nordisk A/S den 19. marts 2015. Aktierne blev købt fra brokeren (…) til i alt 2.142.698.582,7 kr., svarende til 341,90 kr. pr. aktie.

[Pensionsplan C] blev stiftet i september 2014, og pensionsplanen har ikke gennem Form 5500 oplyst om aktiver med samlet værdi på mere end $ 250.000 til de amerikanske skattemyndigheder (…). Det er dybt urealistisk, at en sådan pensionsplan uden aktiver af nævneværdig betydning skulle købe aktier for mere end 2,1 mia. kr. i et dansk børsnoteret selskab.

Derudover er det urealistisk, at det skulle være muligt at erhverve en så stor aktiepost på én dag. Det er meget sjældent, at så store aktieposter sættes til salg på én gang. Da dødsboet efter Mærsk Mc-Kinney Møller skulle sælge aktier for op til 3,9 mia. kr., skete det gennem accelereret bookbuilding – ikke på det frie marked (…).

Alligevel kunne den pågældende pensionsplans broker, (…), fremskaffe aktieposten med en kurs-værdi på cirka 2,1 mia. kr.

[Pensionsplan C] er langt fra den eneste pensionsplan, der påstår at have erhvervet Novo Nordisk-aktier for ca. 2 milliarder kr. den 19. marts 2015.

Ud af de over 100 pensionsplaner, der er repræsenteret af TVC Advokatfirma – og som har fremlagt custody statement (…) – har 76 pensionsplaner ifølge deres custody statements (…) købt aktier i Novo Nordisk A/S den 19. marts 2015. Pensionsplanerne har *hver* købt mellem 5,7 millioner aktier og 7,1 millioner aktier (svarende til Novo Nordisk-aktier for ca. 2 milliarder kr. for hver pensionsplan).

Samlet har disse 76 pensionsplaner erhvervet 482 mio. aktier i Novo Nordisk *samme dag*. Der var i alt 2.113 millioner B-aktier i selskabet, og pensionsplanerne repræsenteret af TVC Advokatfirma har dermed erhvervet mere end 22 % af Novo Nordisk-aktierne *på én dag*.

Det giver simpelthen ikke mening.

Dels har pensionsplanerne ikke haft råd til det. Og dels vil det ganske enkelt ikke være praktisk muligt at finde *sælgere* af så mange aktier på én dag.

Alle aktierne blev erhvervet til *samme* kurs, nemlig 341,9 kr. pr. aktie, hvilket var markedets lukkekurs den pågældende dato, hvor kursen havde varieret mellem 335 og 342 kr. (…). Næste dag åbnede aktien med kurs 341,7 kr.

Det er i sig selv påfaldende, at alle pensionsplanerne erhvervede Novo Nordisk-aktierne til *præcis samme kurs*. Derudover siger det sig selv, at det ikke er muligt at opkøbe så mange aktier i markedet på én dag, uden at det påvirker prisen voldsomt. En så massiv efterspørgsel ville selvfølgelig føre til en markant kursstigning. Når markedskursen har været upåvirket af så massive handler på én dag, skyldes det selvfølgelig, at handlerne *faktisk* ikke har fundet sted.

Novo Nordisk-aktien i 2015 er ikke det eneste sted, hvor der ifølge refusionsanmodningerne til SKAT skulle have fundet meget betydelige opkøb sted. Skattestyrelsen har foretaget en analyse af samtlige refusionsanmodninger omfattet af sagskomplekset (jf. støttebilaget, afsnit 5). Analysen viser, at de ukendte pensionsplaner, selskaber, mv. tilsammen – ifølge deres refusionsanmodninger – skulle have ejet nogle helt urealistisk store andele af danske børsnoterede selskaber omkring udbyttedatoen (…).

Eksempelvis fremhæves følgende ejerandele til pensionsplaner:

**På udlodningstidspunktet i 2014**

| | |
|---|---|
| A.P. Møller | 51,4 % |
| Novo Nordisk | 59,5 % |
| TDC (august-udlodningen) | 78,4 % |

**På udlodningstidspunktet i 2015**

| | |
|---|---|
| Carlsberg | 58,5 % |
| Danske Bank | 65,3 % |
| Novo Nordisk | 61,7 % |

TDC (marts-udlodningen)        79,7 %

Det vil altså sige, at f.eks. 65,3 % af aktierne i Danske Bank skulle have været ejet af ukendte, uden-landske pensionsplaner mv. omkring udbyttedatoen i 2015. Det er selvfølgelig ikke rigtigt.

**4.2    Pensionsplanernes fortjeneste svarer præcis til udbytterefusionen**

Det fremgår af (…), som eksempel, at sælger og købers samlede arbitragegevinst – som svarer til refusionen – fordeles med 87,5 % til sælger og 12,5 % til køber (pensionsplanerne). Eksemplet hæn-ger ikke sammen med de bilag, som pensionsplanerne har fremlagt.

Som eksempel kan fremhæves [Pensionsplan D's] køb af Danske Bank-aktier (…), der er repræsenta-tivt. Heraf fremgår følgende transaktioner, der angår køb/salg af aktier, lån og forwards:

| | | | | |
|---|---|---|---|---|
| **18. Mär 15** | **Equity** | Buy 3.519.967 Danske Bank A/S @ 175,3 DKK | | -617.050.215,10 |
| 18. Mär 15 | Forward | Sell 3.519.967 Danske Bank A/S @ 171,2147 DKK EXPIRES 19.Jun 15 | | |
| 19. Mär 15 | Dividend | CASH DIVIDEND Danske Bank A/S  PD 23.Mär 15 | 14.132.667,50 | |
| **20. Mär 15** | **Stock Loan** | Lend 3.519.967 Danske Bank A/S @ 175,3 DKK | 617.050.215,10 | |
| 22. Mai 15 | Dividend | Tax Reclaim Danske Bank A/S | 5.227.151,00 | |
| **02. Jun 15** | **Equity** | Sell 3.519.967 Danske Bank A/S @ 198 DKK | 696.953.466,00 | |
| 02. Jun 15 | Forward | Buy 3.519.967 Danske Bank A/S @ 197,9673 DKK EXPIRES 19.Jun 15 | | -94.168.269,17 |
| **02. Jun 15** | **Stock Loan** | Recall 3.519.967 Danske Bank A/S @ 198 DKK | | -696.953.466,00 |
| 02. Jun 15 | Stock Loan | Stockloan MTM Realized | 79.903.250,90 | |
| **02. Jun 15** | **Stock Loan** | Stocklending Fee | 132.350,77 | |

Når disse "pengestrømme" lægges sammen, fremkommer resultatet af aktiekøb, aktiesalg, aktielån og forward-aftale samt nettoudbytte og refusion for pensionsplanen. Resultatet af disse transaktio-ner er en fortjeneste for [Pensionsplan D] på 5.227.151,00 kr.

Det svarer helt nøjagtigt til refusionen ("Tax Reclaim Danske Bank A/S" i tabellens 5. linje, ovenfor).

Pensionsplanens fortjeneste er altså lig med udbytterefusionen. Dog betales enkelte mindre gebyrer til brokers (…), tax reclaim agent (…) og for brug af platformen (…).

Det betyder, at hvis ikke refusionen medregnes, går alle transaktionerne altså samlet i 0.

Og samme 0-resultat (før refusionen) genfindes for hver enkelt af de 6 førersager (…)

(…)

Og ud fra custody statements (…) kan samme resultat ses ved alle transaktioner for alle pensionspla-nerne.

I alle tilfælde er det dermed pensionsplanen, der oppebærer hele arbitragegevinsten – som nøjagtigt svarer til udbytterefusionen. Også dette forhold dokumenterer i sig selv, at pensionsplanerne har påberåbt sig ret til udbytterefusion på et opdigtet grundlag.

**4.3    Der er intet forretningsmæssigt rationale bag de påståede transaktioner (nyt)**

Pensionsplanerne gør gældende, at de alle har anvendt investeringsstrategien "udbyttearbitrage" (…):

> *"Ved at købe aktien, modtage nettoudbyttet samt refusion af indeholdt udbytte-skat og sælge aktien igen til en lavere pris (aktieprisen falder efter udbetaling af udbytte) kunne pensionsplanen realisere en gevinst. Det var denne gevinst, der var formålet med hele transaktionen."* (…)

> *"Udbyttearbitrage er en lavrisikoinvesteringsstrategi, der forårsages af, at et ud-bytte på grund af forskellige dobbeltbeskatningsoverenskomster ikke har den samme værdi for enhver investor. Investorer uden en dobbeltbeskatningsaftale vil søge at sælge deres aktier til markedet inden udbyttedatoen, mens investorer med gunstige betingelser i dobbeltbeskatningsoverenskomsterne vil søge at købe aktier inden udbyttedatoen. De forskellige ønsker i forhold til køb og salg fører umiddel-bart til prisforskelle på de forskellige markeder (spot- og futuremarkedet) for samme aktie. Det er denne forskel, som udbyttearbitragen benytter med henblik på at realisere en gevinst."* (…)

Pensionsplanerne gør således gældende, at der kan opnås en gevinst ved handel af aktier omkring udbyttedatoen, fordi aktieudbyttet ikke har samme værdi for alle investorer, idet nogle investorer skal betale udbytteskat, mens andre ikke skal. Den påståede arbitragegevinst – som opnås ved handel på forskellige markeder og et komplekst set-up af transaktioner mellem *mange* parter – er dermed højst den udbytteskat, som kan spares.

Den <u>samlede gevinst</u> for *alle* deltagere i udbyttearbitrage kan derfor ikke være mere end udbytterefusionen (den sparede skat).

Skattestyrelsen bestrider helt overordnet, at udbyttearbitrage skulle være en anerkendt investerings-strategi, som kan fungere som en ren pengemaskine. Der er ingen dokumentation for, at aktie- og spotmarkedet skulle opføre sig, som TVC Advokatfirma påstår.

Selv *hvis* udbyttearbitrage var en mulig investeringsstrategi, hænger pensionsplanernes dokumenta-tion ikke sammen.

Den påståede investeringsstrategi kræver, at en lang række parter involveres:

| Part | Ydelse |
|---|---|
| Sælger | Leverer aktierne |
| Pensionsplanen | ? |
| Køber | Aftager aktierne. |
| Aktielåntager | Leverer finansiering. |
| Forward-køber/-sælger | Afdækker kursrisici. |
| Custodian | Indestår for solvens og gennemførsel af transaktioner. |

Som det fremgår, byder hver part – bortset fra pensionsplanen – efter det oplyste ind med noget, der er nødvendigt, for at transaktionerne kan gennemføres med det ønskede resultat. Det siger der-for sig selv, at alle parter skal have en del af fortjenesten, før det giver mening for dem at indgå i arbitrageforretningen. Ellers er der intet forretningsmæssigt rationale for dem for at deltage i dette set-up, der naturligvis medfører en række risici, f.eks. medkontrahenters misligholdelse og medkon-trahenters insolvens.

Som det fremgår i afsnit 4.2, ovenfor, giver arbitrageforretningen pensionsplanen et positivt resultat, der er *lig* med udbytterefusionen. Det er den samlede, maksimale gevinst for udbyttearbitragefor-retningen. Og den oppebærer pensionsplanen *alene*.

Pensionsplanen deler dermed ikke arbitragevinsten med nogen. Det betyder, at *ingen* øvrige parter får nogen gevinst ud af at deltage i dette set-up – bortset fra de små fees, som de får for gennemførsel af transaktioner.

Ingen af de øvrige parter har dermed noget forretningsmæssigt incitament til at indgå i arbitrageforretningen. Det gælder for <u>samtlige</u> af de handler, som pensionsplanerne repræsenteret af TVC Advokatfirma påstår at have indgået og har fremlagt "dokumentation" for.

De øvrige parter ville derfor ikke have deltaget i dette set-up, hvis der var tale om rigtige handler. Også af den grund er det helt urealistisk, at handlerne skulle have fundet sted.

### 4.4     Nulresultatet ved investeringerne er dybt usandsynligt

Som anført i afsnit 4.2, ovenfor, er det påfaldende, at pensionsplanernes fortjeneste er helt lig  med udbytterefusionen, når der tages højde for

- Aktiekøb og -salg
- Forward-aftaler
- Aktielån og låneomkostninger (Stock Lending Fee og Interest Rebate)
- Nettoudbytte

Alle disse transaktioner tilsammen giver helt præcis 0 kr. for <u>alle</u> påståede aktiehandler for <u>alle</u> pensionsplaner, der har fremlagt dokumentation.

Et sådant resultat kan ikke opnås i virkeligheden, men kun som bogføringsmæssige posteringer, der koordineres fra centralt hold.

Det er nemlig dybt usandsynligt, at gebyret i aktielånsaftalen skal svare netop til tabet/gevinsten ved forwardaftalen sammenlagt med kursudsvingene ved køb/salg i bare ét enkelt tilfælde. Og derfor er det selvfølgelig umuligt, at det konsekvent forholder sig sådan.

### 4.5     Nulresultatet nås alene ved hjælp af "regnefejl" (nyt)

En bestanddel i nulresultatet er låneomkostningerne, som angiveligt afregnes over for medkontrahenten til aktielånet. Låneomkostningerne består af Interest Rebate og Stock Lending Fee.

Stock Lending Fee *burde* beregnes ud fra en aftalt Stock Lending Rate, det lånte beløb og låneperiodens længde, dvs. efter følgende formel:

$$Stock\ Lending\ Fee = Stock\ Lending\ Rate * Beløb * \frac{Rentedage}{360\ rentebærende\ dage}$$

Der er imidlertid *ingen* tilfælde, hvor Stock Lending Fee er fastsat på denne måde. I stedet er Stock Lending Fee fastsat til netop dét beløb, der skal til, for at det samlede regnestykke giver 0. Stock Lending Fee er med andre ord beregnet som en variabel, der får regnestykket til at give 0.

Som eksempel kan fremhæves [Pensionsplan B's] udlån af 998.992 stk. Coloplast-aktier i 2014. Heraf fremgår følgende af custody statement ...):

| Settlement Date | Return Date | Type | Underlying | Nominal | Start Price | Start Cash | End Price | End Cash |
|---|---|---|---|---|---|---|---|---|
| 09 December 2014 | 19 December 2014 | Lend | COLOB DC | 998,992 | 527.0000 | 526,468,784.00 | 501.5000 | -500,994,488.00 |

| Trade Date | Nominal | Cash | Return Date | No. of Days | Rate | Stock Lending Fee | Rate | Interest Rebate |
|---|---|---|---|---|---|---|---|---|
| 08 December 2014 | 998,992 | 526,468,784.00 | 19 December 2014 | 10 | -0.0173 | -2,525.23 | 0.7000 | -102,368.93 |

Her udlånes angiveligt 526.468.784 kr. i 10 dage til en aftalt Stock Lending Rate på 0,0173 %. Dermed *burde* Stock Lending Fee være:

$$Stock\ Lending\ Fee = Stock\ Lending\ Rate * Beløb * \frac{Rentedage}{360} = 0,0173\ \% * 526.468.784 * \frac{10}{360} = \mathbf{2.529,97\ kr.}$$

Som det fremgår af custody statement ovenfor, er Stock Lending Fee imidlertid blevet fastsat til 2.525,23 kr.

Det er en afvigelse på 4,74 kr., hvilket jo forekommer ubetydeligt i handler, der involverer mange hundrede millioner kroner. Afvigelsen er imidlertid af stor betydning for det samlede billede.

Afvigelsen kan nemlig findes ved alle pensionsplaners aktiehandler. Der er i alle tilfælde en "regne-fejl", som medfører, at transaktionerne (køb, salg, forward, lån, låneomkostninger og nettoudbytte) til sammen giver 0 kr.

"Fejlen" underbygger, at der *ikke* er tale om, at uafhængige parter har indgået aktiehandler og aktie-lånsaftaler. Derimod har *nogen* beregnet, hvordan transaktionerne skulle konstrueres, for at det samlede resultat ville blive 0.

Det understøttes i øvrigt af, at Stock Lending Rate tilsyneladende er aftalt til en anden sats end den, der fremgår af custody statement (afsnit 3.2.5, ovenfor).

Ved at "regne baglæns" er det muligt at beregne Stock Lending Rate ud fra Stock Lending Fee, låne-beløbet og antallet af rentedage. For [Pensionsplan B's] udlån af Coloplast-aktier (eksemplet ovenfor) giver det følgende "faktisk" Stock Lending Rate:

$$Stock\ Lending\ Rate = \frac{Stock\ Lending\ Fee}{Beløb * \frac{Rentedage}{360}} = \frac{2.525,23}{526.468.784 * \frac{10}{360}} = 0,01726755370172150\ \%$$

Stock Lending Fee stemmer dermed overens med en Stock Lending Rate, der *næsten* svarer til den Rate, der er angivet i Custody Statement (0,0173 %). Faktisk er Rate i Custody statement (formentlig) bare en afrunding af den Stock Lending Rate, der er blevet anvendt.

Det giver imidlertid *ingen* mening kommercielt. For pensionsplanerne og deres medkontrahenter, aktielåntagerne, har jo aftalt en Stock Lending Rate – og den er selvfølgelig ikke aftalt med 15 deci-maler. Det er ud fra dén Rate, at Stock Lending Fee burde være fastsat. Det er ikke den anden vej rundt.

Dermed er der tale om, at der ved udarbejdelsen af custody statement (…) er snydt på vægtskålen for at få transaktionerne til at gå i 0. Stock Lending Fee-beløbet er bare blevet fastsat til det beløb, der skal bruges for, at regnestykket giver 0. Dette er efterfølgende søgt kamufleret ved at sætte Stock Lending Rate til noget, der *næsten* giver det rigtige resultat.

**5.    FEJL OG MANGLER VISER, AT DER IKKE ER HANDLET AKTIER**

**5.1    Der er ingen dokumentation for, at pensionsplanernes custodians ("Solo-gruppen") har besiddet aktier**

Alle pensionsplaner repræsenteret af TVC Advokatfirma, bortset fra én, har anvendt en eller flere af følgende 4 custodians: Old Park Lane, Solo Capital, Telesto og West Point.

(...)

De fire custodians – Old Park Lane, Solo Capital, Telesto og West Point – benævnes samlet "Solo-gruppen". De fire selskaber er blevet kontrolleret af Sanjay Shah (afsnit 6.6, nedenfor), der efterforskes som en af de formodede hovedbagmænd i udbyttesagen.

Solo-gruppen er kun kendt af Skattestyrelsen fra dette sagskompleks.

Som custodians har Solo Capital, Old Park Lane, Telesto og West Point attesteret ejerskab til danske aktier, og at der er blevet indeholdt udbytteskat ved udlodning. Det er sket ved udstedelse af Credit Advices, som ifølge pensionsplanerne bekræfter besiddelse af en given aktiepost, modtagelse af udbytte for den pågældende aktiepost, og at der er blevet indeholdt udbytteskat. På baggrund af de pågældende Credit Advices (som pensionsplanerne indsendte med refusionsanmodningerne) har SKAT udbetalt refusion af indeholdt udbytteskat til pensionsplanernes agenter.

Credit Advices udarbejdet af Solo-gruppen har ført til refusion af ca. 9 milliarder kr. ud af de i alt ca. 12,7 milliarder kr., der er omfattet af svindlen:

| Custodian | Refusionsbeløb |
|---|---|
| Solo Capital Partners LLP | 5.442.113.750 |
| Old Park Lane Capital PLC | 1.776.763.390 |
| Telesto Markets LLP | 925.443.359 kr. |
| West Point Derivatives Ltd | 880.884.044 kr. |
| *Hovedtotal* | *9.025.204.543* |

Solo-gruppen skal dermed have besiddet aktier i et helt ekstraordinært stort (og urealistisk) omfang på vegne af pensionsplaner, hvis kunderne/pensionsplanerne skal have været berettiget til refusion i dette omfang. Solo-gruppen har ifølge de udstedte Credit Advices samlet modtaget og afregnet 24,4 milliarder kroner i nettoudbytte til sine kunder.

Der er imidlertid *ingen* dokumentation for, at Solo-gruppen har besiddet de aktier, som pensionsplanen påstår at have ejet, og som Solo-gruppen har attesteret ejerskab til:

- Ingen af de pågældende custodians (eller pensionsplanerne selv) er registreret i VP Securities, og det er ikke på anden vis dokumenteret, at Solo-gruppen faktisk har besiddet aktieposter for pensionsplanerne, f.eks. ved at vise en kæde af sub-custodians, hvor der er tilknytning til et depot i VP Securities.

- Der er ikke fremlagt dokumentation for, at Solo-gruppen skulle have modtaget nettoudbytte for aktieposter på vegne af sine kunder (pensionsplanerne). Nettoudbyttet burde ellers udgøre 24,4 milliarder kroner.

- For en række pensionsplaner, der har anvendt Solo-gruppen som custodians, har Statsadvokaten for Særlig Økonomisk og International Kriminalitet (SØIK) i brev af 23. november 2017 oplyst SKAT, at SØIK ikke på baggrund af den på daværende tidspunkt gennemførte efterforskning kunne bekræfte, at 66 konkrete pensionsplaner har modtaget aktieudbytte som følge af besiddelse af danske aktier. SØIK kunne heller ikke bekræfte, at pensionsplanerne har besiddet danske aktier, herunder ved henvendelse til VP Securities A/S (…). Erklæringen er blevet bekræftet den 12. juli 2019 (…).

- Der er ikke fremlagt dokumentation for pengestrømme til/fra Solo-gruppen som følge af de betydelige investeringer i danske aktier.

Der er således ingen penge- eller aktiespor, som på nogen måde dokumenterer, endsige sandsynliggør, at Solo-gruppen skulle have besiddet én eneste aktie i danske selskaber på vegne af pensionsplanerne.

Alligevel har Solo-gruppen udstedt dokumenter (bl.a. Credit Advices), der har ført til refusion af over 9 mia. kr. fra den danske stat på baggrund af påståede aktiebesiddelser.

Solo-gruppens "univers" er fiktivt og konstrueret af Sanjay Shah, og dokumenter udstedt af Solo-gruppen er derfor uden nogen bevismæssig betydning.

**5.2    Pensionsplanerne henviser til intern bogføring hos deres custodians ("Custody Statements" – (…))**

Pensionsplanerne har som (…) fremlagt en custody statement udarbejdet af deres respektive custodians. [Pensionsplan C] har dog kun fremlagt custody statement for én af flere anvendte Shah-kontrollerede custodians, hvilket også er kendetegnende for en række øvrige pensionsplaner.

(…)

Under alle omstændigheder kan de pågældende custody statements (…) ikke dokumentere ejerskab til aktier, idet bilagene ikke viser bevægelser og saldi vedrørende pensionsplanernes aktiebeholdninger og penge (dvs. de aktiver, som custodian skulle have i forvaring).

Af de fremlagte custody statements (…) fremgår således <u>for det første</u> ikke kontoudtog vedrørende pensionsplanernes *kontant*beholdninger, der viser bevægelser og daglige balancer, herunder indsætning og hævning af pengebeløb, udgående og indgående beløb vedrørende køb og salg af aktier, modtagelse af indtægter (f.eks. udbytte, refusion og renter) og betaling af fees til f.eks. brokere.

De fremlagte custody statements indeholder <u>for det andet</u> ikke kontoudtog vedrørende pensionsplanernes *aktie*beholdninger, der for hver aktiepost viser navnet på aktieudstederen, antallet af aktier, stigning og fald i antallet af aktier (som følge af køb og salg af aktier) samt aktuel værdi af de pågældende aktier (samt opgørelse af kursgevinst eller -tab).

Da de fremlagte custody statements mangler disse helt centrale oplysninger, er det vildledende overhovedet at betegne dem som "custody statements".

Der er altså ikke med de fremlagte custody statements (…) – eller i øvrigt – fremlagt kontoudtog, der dokumenterer, at der faktisk er indsat penge på og trukket penge fra pensionsplanens konto, endsige at der faktisk er modtaget aktier på pensionsplanens aktiekonto.

I det hele taget er der ikke dokumentation for, at der er sket overførsel af aktier til – og penge fra - pensionsplanens konto.

Hvis penge og aktier ikke skifter hænder – hvilket vil fremgå af kontoudtog – er der ikke tale om en aktiehandel, men højest om svindel *kamufleret* som en aktiehandel.

Hvis penge og aktier ikke skifter hænder, vil der heller ikke være noget formål med at have en custodian (udover at kamuflere svindlen).

Det eneste "bevis" i denne custody statement for, at der skulle være aktier og betalinger, er, at den pågældende Shah-kontrollerede custodian "erklærer", at aktien er der, og "posterer" aktier/betalinger bogføringsmæssigt (internt). Ligesom Credit Advices fra disse Shah-kontrollerede custodians ikke er udtryk for nogen realitet, jf. afsnit 6.8-6.9, nedenfor, er deres interne bogføring det naturligvis heller ikke.

**5.3     Efterfølgende udarbejdede oversigter over bogføringer beviser ingenting**

Pensionsplanerne har fremlagt "oversigt over bogføringer" (…). Herom anføres i (…), at "*De enkelte bogføringer på pensionsplanens konto hos dens custodian fremgår af oversigten, der fremlægges som (…)*". Der er fremlagt en sådan oversigt for hver af (…) sagerne.

(…)

De fremlagte oversigter over bogføringer (…) er ikke kontoudtog, men alene udklip fra udaterede Excel-ark, som ikke har noget autoritativt præg. Skattestyrelsen påpegede i (…) en række fejl ved disse oversigter:

- Transaktioner er posteret på handelsdatoen og ikke på leveringsdatoen.
- Oversigterne rummer ikke alle posteringer for en given periode.
- Posteringer, der ikke fremgår af custody statement, fremgår alligevel af oversigten. Der gælder f.eks. gebyrer til brokere og custodian samt udbetaling af udbytterefusion.
- "*Stocklending Fee*" fremgår af oversigten, men svarer til "*Total Fees and Rebates*"

Oversigterne kan derfor ikke anvendes.

Pensionsplanerne har efterfølgende oplyst, at oversigterne blot er "*et resumé af begivenhederne, som er udarbejdet af [pensionsplanernes repræsentant] på basis af de optegnelser over handlerne, som pensionsplanerne havde til rådighed.*" (…). Det fremgår ikke, hvilke "optegnelser" der er tale om.

Videre har pensionsplanerne anført, at "*De uoverensstemmelser, der er konstateret, er opstået ved de forenklinger, som er foretaget i oversigterne, der er udarbejdet af Schaffelhuber Müller & Kollegen S.à.r.l., for at forklare transaktionerne på en simpel måde for Skatteankestyrelsen.*" (…).

Sådanne oversigter udarbejdet efterfølgende til brug for klagesagen har ingen bevisværdi.

Det er i øvrigt påfaldende, at pensionsplanernes repræsentant i (…) har kunnet anføre oplysninger om f.eks. udbetaling af udbytterefusion til pensionsplanen og gebyrer, når sådanne oplysninger *ikke* fremgår af custody statement (…), men derimod efter sigende af en cash account, som pensionsplanerne ikke er i besiddelse af (…).

**5.4       Broker Confirmations (…) dokumenterer ikke ejerskab**

**5.4.1     Brokere gennemfører ikke handlen (nyt)**

I alle tilfælde har pensionsplanerne angiveligt anvendt en executing broker. Pensionsplanen gør gældende (…), at der er blevet afgivet en købsordre til custodian/clearing agent, der er en del af Solo-gruppen. Der er ikke fremlagt dokumentation for disse købsordrer. Når custodian har godkendt ordren, er ordren blevet placeret hos en executing broker.

Executing broker har angiveligt haft ansvaret for matching af ordren – dvs. at finde en køber/sælger til den givne aktiepost. Efter matching har brokeren udstedt en handelsnota (broker confirmation – (…)), hvor vilkårene for handlen fremgår.

Herefter har pensionsplanens custodian angiveligt sørget for clearing af handlen (…). Det vil sige, at det er en custodian fra Solo-gruppen, som har haft ansvaret for og kontrollen med, om handlen *faktisk* blev gennemført ved udveksling af aktier og penge.

De fremlagte handelsnotaer dokumenterer dermed ikke, at pensionsplanerne faktisk har købt aktier. En handelsnota er alene en bekræftelse af en aftale om aktiehandel med angivelse af centrale aftalevilkår. En handelsnota dokumenterer ikke, at aktiehandlen faktisk er blevet gennemført, allerede fordi brokeren ikke ved, om handlen er blevet gennemført i overensstemmelse med det aftalte.

Allerede af den grund kan materialet fra brokerne ikke bevise, at pensionsplanerne har besiddet aktier.

Pensionsplanerne tillægger handelsnotaerne ("broker confirmations") i (…) betydelig vægt. Det anføres i (…), at handelsnotaerne *"er den afgørende dokumentation for, at en et aktiekøb har fundet sted"*, og at handelsnotaerne er *"den afgørende dokumentation mod påstandene om svindel"*, (…).

Dette er forkert, eftersom handelsnotaerne ikke dokumenterer gennemførsel af handlen (udveksling af penge og aktier). I komplekset har brugen af brokere og fremlæggelse af handelsnotaer alene til formål at skjule, at der faktisk slet ikke er sket nogen aktiehandler.

**5.4.2     Der er flere uoverensstemmelser mellem de påståede aktiebesiddelser og handelsnotaerne (nyt)**

*Hvis* pensionsplanerne faktisk havde handlet med aktier, burde forløbet være som følger, når der anvendes en executing broker:

1.   Pensionsplanen afgiver en ordre (f.eks. om køb) – evt. efter godkendelse fra custodian
2.   Brokeren matcher pensionsplanen med en medkontrahent (f.eks. en sælger)
3.   Brokeren laver en handelsnota (broker confirmation)
4.   Handlen gennemføres (settlement) i overensstemmelse med aftalen

Hvis det hele var foregået pænt og ordentligt, burde handlen blive gennemført (settlement) ud fra de vilkår, der er angivet i handelsnotaen (medmindre der sker en fejl ved gennemførslen). Med andre ord burde handelsnotaen (ved rigtige aktiehandler) være bestemmende for handlens vilkår.

*I disse sager* har pensionsplanerne dog fremlagt en lang række handelsnotaer, hvor aftalevilkårene ikke stemmer overens med den ordre, som pensionsplanerne angiveligt har afgivet ifølge custody statement (…). Der er tale om meget alvorlige fejl (se afsnit 5.4.3).

*Alligevel* er handlen blevet gennemført i overensstemmelse med pensionsplanens påståede – og udo-kumenterede – købsordre. Det svarer til, at man bestiller en togbillet til Aarhus, sætter sig på et tog til Malmø og alligevel bliver kørt til Aarhus.

Det giver *ingen* mening, at handlerne ikke er gennemført i overensstemmelse med handelsnotaerne. Det giver heller *ingen* mening, at oplysningerne i custody statement (…) ikke er i overensstemmelse med aftalevilkårene i handelsnotaerne (…).

Yderligere savner det mening, at pensionsplanerne ikke har reageret på betydelige fejl i handelsno-taer, der bekræfter aktiehandler til betydelige millionbeløb.

Det fremgår da også af en række handelsnotaer, at pensionsplanerne er forpligtet til at tjekke oplys-ningerne. F.eks. fremgår følgende af en handelsnota fra (…):

> *"Please verify all details for accuracy, and immediately inform (…) of any errors. (…) cannot be held responsible for errors not brought to our attention immediately. The Purchaser and the Seller acknowledge receipt of this confirmation, that the terms contained herein and any and all actions and / or disputes arising therefrom are the sole and exclusive responsibility of the purchaser and the seller, and further agree to hold Brokers, and its agents and / or representatives harmless from any dispute and / or action that may arise as a consequence of the above transaction."*

Som det fremgår, fraskriver (…) sig ansvaret for alle fejl, der ikke straks reklameres over. Henset til handlernes størrelse er det klart, at pensionsplanerne selvfølgelig *ville* have kontrolleret handelsno-taerne nøje og have reageret på uoverensstemmelser, hvis det havde været rigtige aktier. Det gælder særligt, fordi pensionsplanerne ikke ville kunne bære et tab forårsaget af fejl i handelsnotaerne. Når pensionsplanerne ikke har reageret, skyldes det selvfølgelig, at der ikke er foregået aktiehandler, og at der derfor ikke er nogen risici forbundet med en forkert bekræftelse af aftalevilkårene.

Det giver ikke nogen mening, at brokerne kan begå sådanne fejl, når pensionsplanerne samtidig be-tegner brokerne som *"professionelle serviceydere"*, (…). Pensionsplanernes forsøg på at styrke bro-kernes troværdighed med henvisningen til, at brokerne har været igennem en *"særlig kontrolunder-søgelse af det britiske finanstilsyn"*, (…), falder til jorden, når der henses til, hvor fundamentale fejlene er.

### 5.4.3   Konkrete eksempler på fejl i handelsnotaer

Der er mange tilfælde, hvor handelsnotaerne (…) ikke stemmer overens med oplysningerne i custody statements (…) og Credit Advices (…). Det indebærer, at den udokumenterede settlement, som pen-sionsplanerne påberåber sig med henvisning til custody statements (…), ikke passer med vilkårene i handelsnotaerne (…). Pensionsplanerne har ikke fremlagt nogen dokumentation for, hvordan settle-ment skulle være sket korrekt, til trods for at handelsnotaerne var fejlbehæftede.

#### 5.4.3.1   To forskellige handelsdatoer for samme transaktion

(…) viser et tilfælde, hvor der er anvendt to forskellige handelsdatoer ("Trade Dates"), hhv. den 5. marts 2015 og den 31. marts 2015, for samme påståede aktiehandel med 3.092.779 TDC-aktier med en værdi på ca. 167 mio. kr.

Bilaget består af en Credit Advice, et custody statement, en regning fra brokeren (…) og en handels-nota fra samme. Dokumenterne relaterer sig til [Pensionsplan C] og er allerede blevet fremlagt i sa-gen.

Det custody statement, der er fremlagt i sagen, findes på (…). Dokumentet er udarbejdet af [Pensionsplan C's] custodian, West Point (som er en Shah-custodian). Det fremgår heraf, at handelsdagen ("Trade Date" indrammet med rødt) er *den 5. marts 2015*, og at handlen med 3.092.779 TDC-aktier er et køb ("Buy" indrammet med rødt).

Den Credit Advice, der er fremlagt i sagen, findes på (…). Dokumentet er ligeledes udarbejdet af West Point. Det er dateret den 10. marts 2015 og fortæller, at [Pensionsplac C] ejede 3.092.779 TDC-aktier hen over ex-dagen den 6. marts 2015 ("Ex Date" indrammet med rødt). Credit Advicen understøttes altså af den i custody statementet angivne handelsdato.

Den handelsnota, der er fremlagt i sagen, findes på (…). Dokumentet er udarbejdet af brokeren, (…), der tilsyneladende har forestået handlen med TDC-aktierne. Det fremgår af handelsnotaen, at handelsdagen ("Trade Date" indrammet med rødt) er *den 31. marts 2015*, og at handlen med 3.092.779 TDC-aktier vedrører et *køb* ("BUY" indrammet med rødt).

Der er således uoverensstemmelse mellem handelsdatoerne for *samme* påståede aktiehandel.

Der er kun én af handelsdatoerne, som kan være rigtig, og hvis handelsnotaen skal tillægges en så *"afgørende"* betydning, som [Pensionsplan C] lægger op til, så må det være den 31. marts 2015. Det vil betyde, at [Pensionsplan C] ikke ejede 3.092.779 TDC-aktier over ex-dagen, og at den Credit Advice, der lå til grund for [Pensionsplacn C's] refusionsanmodning, således ikke er rigtig.

Der er flere forhold, som kunne tyde på, at uoverensstemmelsen mellem custody statement og handelsnotaen skyldes en fejl begået af brokeren.

Først og fremmest fremgår handelsnotaens referencenummer ("TRADE CONFIRMATION REFERENCE: e184376" indrammet med rødt) også af regningen fra (…) af 31. marts 2015 (…). Her er handelsdatoen ("Trade Date" indrammet med rødt) angivet som *den 5. marts 2015* og altså ikke den 31. marts 2015 som angivet i handelsnotaen.

Herudover nævnes den 10. marts 2015 som *afviklingsdag* ("Settlement on 10 March 2015")  under "SETTLEMENT TERMS" i handelsnotaen (…). Denne afviklingsdag fremgår også af custody statement på (…) ("Settlement Date" indrammet med rødt), hvilket kunne tyde på, at fejlen alene omfattede *handelsdagen* angivet af brokeren.

Dette hænger dog ikke sammen med, at "SETTLEMENT TERMS" er angivet som "T+2" i handelsnotaen. Hvis handelsdagen var den 5. marts 2015 (som anført i custody statement), og afviklingsdagen var den 10. marts 2015, så ville handlen være blevet gennemført "T+3" og ikke som angivet "T+2". Den 7. og 8. marts er således lørdag og søndag, mens resten af de mellemliggende dage er arbejdsdage, jf. nærmere om beregningen af leveringstiden i afsnit 5.6, ovenfor.

Forvirringen bliver endnu større, når der i handelsnotaen ovenover "SETTLEMENT TERMS" under "Settlement Date" står "T+1". Heller ikke denne afviklingsperiode er rigtig, hvis handelsdagen var den 5. marts 2015 som forudsat i custody statement.

TVC Advokatfirma anfører da også i (…), at det er *"mægleren, der har begået en fejl"*, og at det var *"et generelt problem, som (…) havde"*.

Det var altså ifølge pensionsplanerne et generelt problem, at handelsnotaer (for aktiehandler på mange hundrede millioner kr.) udarbejdet af brokeren (…) var fejlbehæftet. Det forekommer ganske useriøst af en professionel broker ved så store aktiehandler.

Dertil giver det ikke mening, at handlen er blevet gennemført i overensstemmelse, som oplyst i custody statement, når der fremgår noget andet af den skriftlige aftalebekræftelse (handelsnotaen).

### 5.4.3.2   Handelsnotaer forveksler køb og salg

Der er flere eksempler på, at de påståede aktiehandler fremgår som *salg* under custody statement og brokerens faktura, men fremgår som "BUY" (*køb*) i handelsnotaen (…).

Der er f.eks. uoverensstemmelse mellem custody statement (…) og en handelsnota vedrørende en handel med Mærsk B-aktier (…). (…)

Det fremgår af custody statement, 3. linje, at der er blevet *solgt* ("Transaction Type: Sell") 7.896 Mærsk B-aktier til brokeren, (…) ("Counterparty") med handelsdag den 19. juni 2015 ("Trade Date") og afviklingsdag den 23. juni 2015 ("Settlement Date").

Det fremgår derimod af handelsnotaen, der er udarbejdet af (…), og som vedrører netop 7.896 Mærsk B-aktier, at aktierne er blevet *købt* ("YOU: BUY"). Handelsnotaen er adresseret til [Pensionsplan B], og "YOU: BUY" betyder således, at [Pensionsplan B] *køber* 7.896 Mærsk B-aktier.

Ifølge TVC Advokatfirma er dette *"ligeledes udtryk for en menneskelig fejltagelse"*, og pensionsplanen *"har ikke bemærket denne skrivefejl"*, (…), selvom det må siges at være en ret afgørende fejl.

Igen er det meget bemærkelsesværdigt, at [Pensionsplan B] angiveligt endte med at sælge aktier i overensstemmelse med intentionerne, selvom brokeren, som stod for matching mellem køber og sælger, ifølge handelsnotaen har opfattet [Pensionsplan B] som køber – og dermed må have matchet med en sælger, ikke en anden køber.

### 5.4.3.3   Handelsnotaer tager ikke højde for helligdage (nyt)

Et andet eksempel på broker-fejl findes ved settlement-vilkår omkring danske helligdage, særligt påsken. Som eksempel fremlægges (…).

Settlement/levering af aktier henholdsvis penge er af afgørende betydning ved indgåelse af handler. Det er af betydning for, hvornår finansiering skal skaffes, og hvornår man opnår faktisk rådighed over aktieposten/købesummen.

Settlement angives typisk i handelsnotaer som "T + (antal dage)". Ved settlement "T + 2" skal aktier og betaling udveksles på dag nr. 2 regnet fra aftaledatoen. Når dagene tælles, er det kun hverdage, der skal tælles med. Det varierer fra land til land, hvilke dage der er hverdage.

Hverdage fastlægges ud fra markedet i det land, hvor aktien handles (dvs. Danmark, når det er danske aktier).

[Pensionsplan C] købte ifølge (…) 375.802 aktier i Vestas Wind i marts 2015 (…). Aftalen blev ifølge handelsnotaen indgået mandag den 30. marts 2015, og settlement skulle ske "T + 6", dvs. seks hverdage senere (…). I henhold til Custody statement skete levering tirsdag den 7. april 2015 (…).

Levering skete dermed ifølge den danske helligdagskalender tre hverdage efter aftaleindgåelsen, dvs. T+3:

| | | | Kalender | | | | |
|---|---|---|---|---|---|---|---|
| | | | Aktie-udstederen | Normal cyklus | **Danmark** | England | USA |
| Settlement, aktier | CUM | Mandag d. 30. marts 2015 | | Trade date (T) | Trade date (T) | Trade date (T) | Trade date (T) |
| | | Tirsdag d. 31. marts 2015 | Dividend Ex-date | T + 1 | T + 1 | T + 1 | T + 1 |
| | | Onsdag d. 1. april 2015 | Dividend Record Date | Normal Settle-ment (T + 2) | T + 2 | T + 2 | T + 2 |
| | EX | Torsdag d. 2. april 2015 | | Skærtorsdag | | T + 3 | T + 3 |
| | | Fredag d. 3. april 2015 | | Langfredag | | | |
| | | Lørdag d. 4. april 2015 | | | | | |
| | | Søndag d. 5. april 2015 | | | | | |
| | | Mandag d. 6. april 2015 | | 2. påskedag | | | T + 4 |
| | | Tirsdag d. 7. april 2015 | | | **T + 3** | T + 4 | T + 5 |

*De grå felter markerer weekend- og helligdage i de pågældende lande.*

Det er bemærkelsesværdigt, at levering skete T+3 (nemlig tirsdag den 7. april 2015), selvom der var aftalt levering T+6. Levering T+6 ville have indebåret levering fredag den 10. april 2015. Som tabellen viser, stemmer leveringen heller ikke overens med hverken den engelske eller amerikanske hellig-dagskalender.

Levering er altså *ikke* sket i overensstemmelse med det aftalte.

*5.4.3.4   Handelsnota angiver pris som"##########"*

Der er også et eksempel på en handelsnota fra brokeren (…), hvor prisen på pensionsplanens salg af 7.884 Mærsk-aktier er angivet som " ##########" (…). Prisen var 12.290 kr. pr. aktie, dvs. samlet 96.894.360 kr.

I så store handler tjekker de ansvarlige parter selvfølgelig, at det er de rigtige tal, herunder priser, som er på bekræftelsen. Det skriger til himlen og springer i øjnene, når købesummen er angivet som "##########".

TVC Advokatfirmas forklaring svækker pensionsplanernes sag. Det er – ifølge TVC Advokatfirma – *"tydeligvis en computerfejl"*, som om det gør noget i relation til, hvorvidt man ville opdage  det.

TVC Advokatfirma har som (…) fremlagt en mail fra brokeren, (…), hvoraf det fremgår, at fejlen skyldes, at kolonnen i det underliggende excel-ark ikke var stort nok til at indeholde prisen. Der er med mailen fremlagt en ny handelsnota (…). Det forøger mystikken gevaldigt. Underskriveren af mailen, (…), oplyser selv, at han nu er ansat i (…). Uanset at han ikke længere er ansat i (…), udsteder han alligevel en ny handelsnota på (…)s brevpapir ved at rette i det relevante Excel-ark. Det forekommer meget besynderligt.

Det er derudover utroværdigt, når (…) i sin mail af 16. maj 2019 bekræfter, at den reviderede handelsnota *"accurately reflects"* omhandlede den aktiehandel, der skulle være foretaget den 22. juni 2015, dvs. 4 år tidligere. Troværdigheden svækkes yderligere af, at det ikke var Adrian Milne selv – men Patrick Milne – der er anført som broker på de "oprindelige" handelsnotaer.

### 5.4.3.5   Fejlangivelse af afviklingsdagen

Alle ovennævnte fejl og uoverensstemmelser er fundet i førersagerne. Hvis man begynder at gennemgå sagerne udenfor førersagerne, fremkommer nye fejl. Eksempelvis fremlægges en handelsnota fra brokeren (…) vedrørende en handel med Coloplast-aktier for [Pensionsplan E]. Her fremgår afviklingsdagen som 9. december 2012, hvilket ikke er i overensstemmelse med hverken custody statement (…) eller Credit Advice (…).

### 5.5    Der er ikke dokumentation for gennemførte handler

Det er ikke dokumenteret, at der for pensionsplanernes påståede aktiehandler er sket settlement, dvs. at aktiehandlerne er gennemført ved, at parternes ydelser (aktier og penge) er blevet udvekslet.

Ifølge pensionsplanerne er afvikling/settlement af en aktiehandel ikke en betingelse for at opnå ejerskab over aktierne, (…). Det er imidlertid åbenbart, at settlement er en forudsætning for, at der er gennemført en aktiehandel. Hvis sælger ikke besidder aktier (inkl. udbytte), som sælger er berettiget til at sælge, foreligger der vanhjemmel. Hvis der som følge heraf ikke sker settlement, vil aktier og penge ikke have skiftet hænder, og der vil i så fald ikke være om en (gennemført) aktiehandel. Køberen har jo aldrig erhvervet nogen aktiepost. Det samme gælder, hvis sælger *har* aktier, men handlen af den ene eller anden grund alligevel ikke bliver gennemført.

Der er *intet*, som viser, at der på noget tidspunkt har været aktier i et depot tilhørende pensionsplanernes custodian. Og derfor er det irrelevant, at custodian har "attesteret" pensionsplanernes ejerskab til aktier i Credit Advices, og at broker har bekræftet "handler" i broker confirmations (…). En Credit Advice er kun ord på papir. Og som anført i (…), dokumenterer en broker confirmation ikke, at aktiehandlen faktisk er blevet gennemført.

Langt de fleste af de pensionsplaner, som TVC Advokatfirma repræsenterer, har anmodet om udbytterefusion for mere end ét påstået aktiekøb. Alle de påståede handler vedrører ekstremt store beløb. Når pensionsplanerne påberåber, at afvikling/settlement ikke er nødvendig for at erhverve ejendomsretten, viser det bare, hvor svag pensionsplanernes sag er, når den slags argumenter bruges. For i virkelighedens verden laver man ikke flere sådanne aftaler, uden at der bliver settlet. Og hvis der ikke bliver settlet, vil der være et efterfølgende retsopgør, hvor den part, der taber penge på et sådant manglende settlement, vil kræve erstatning af den anden part.

Der er således ingen dokumentation for, at pensionsplanerne (eller deres custodians) på noget tidspunkt har haft, endsige modtaget, aktier. Det betyder, at der aldrig har været nogen aktiehandler. I den sammenhæng er det irrelevant, om pensionsplanerne *tror*, der har været aktier.

**5.6      Vilkår for settlement er ikke markedskonforme**

Frem til den 6. oktober 2014 var standarden for aktiehandler i Danmark, at aktier blev leveret tre dage efter aftaleindgåelsen (dvs. settlement T+3). Efter 6. oktober 2014 var standarden levering efter to dage (dvs. T+2) (…). Ved beregningen af leveringstid medregnes kun hverdage – dvs. hverken week-ender eller helligdage medregnes.

Pensionsplanernes forklaring om afvikling af de påståede aktiehandler er ikke konsekvent.

I (…), oplyser pensionsplanerne, at afvikling sker to dage efter aftaleindgåelsen, dvs. T+2. I (…) er det anført, at afvikling sker tre dage efter købet, dvs. T+3. Endelig anførte pensionsplanerne (…), at de ved handlerne havde valgt at følge de danske regler for børshandler (…), hvilket pensionsplanerne i mail af 24. april 2019 har præciseret til, at afviklingsdatoen både for OTC-handel og handel på børsen lå to (tidligere tre) dage senere end handelsdatoen (dvs. T+2 og tidligere T+3).

Ifølge custody statements (…) har pensionsplanerne imidlertid konsekvent afveget fra markedsstan-darden ved køb af aktier. Frem til 6. oktober 2014 er aktierne ifølge bilaget købt på vilkår T+4, og efter 6. oktober 2014 er aktierne ifølge bilaget købt på vilkår T+3.

Dertil kommer, at pensionsplanerne ifølge broker confirmations i nogle tilfælde har settlet på helt andre vilkår, f.eks. T+6 (…) eller T+1 (…).

Det af pensionsplanerne anførte stemmer således ikke overens med det fremlagte materiale. I alle tilfælde har der ved levering været aftalt en dags længere leveringstid, end pensionsplanerne anfører i deres indlæg, og længere, end hvad markedsstandarden tilsagde.

Afvigelsen fra markedsvilkårene i custody statement (…) er bemærkelsesværdig, idet afvigelsen – selv hvis der havde været aktiehandler og ikke blot bogføringsmæssige posteringer – i høj grad muliggør svindel. Det skyldes "tidsplanen" ved udlodninger på det danske marked:

Når et selskab beslutter at foretage udlodning, fastsættes en *record date*. De, der er registreret som depotindehavere på den pågældende dato, vil modtage udbyttet.

Når *record date* er fastsat, bliver *ex date* (*ex dividend-date*) fastlagt. Datoen fastlægges af handels-platformen ud fra *record date* og markedsvilkårene for levering af aktier. *Ex date* er den første dag, hvor aktierne handles uden udbytte, dvs. sælgeren får udbetalt udbyttet, selv om aktien er solgt.

Før den 6. oktober 2014 var markedsstandarden, at levering skete T+3. Det betød, at hvis man er-hvervede aktier mandag den 11. august 2014, ville man få aktierne leveret (blive registreret som ejer) torsdag den 14. august 2014. Aktier skulle derfor erhverves tre dage før *record date*, hvis man skulle være registreret som ejer på *record date*. Ved handel to dage før *record date* ville man nemlig – ved almindelige vilkår for levering – ikke længere nå at modtage aktierne, inden selskabet fastlagde ejer-kredsen med henblik på udbetaling af udbyttet – og dermed ville *sælgeren* få udbyttet. *Ex date* var derfor to dage før *record date*.

For at opnå ret til udbytte skulle man derfor erhverve aktier <u>senest</u> tre dage inden *record date*. Der-med ville man – ifølge markedsstandarden – modtage aktierne og være registreret som ejer på det tidspunkt, hvor det udloddende selskab fastlægger ejerkredsen, og man ville få udbyttet udbetalt til sig.

Den 6. oktober 2014 blev markedsstandarden ændret, således levering sker T + 2. Det betyder, at *ex date* blev dagen før *record date* – altså en dag tættere på *record date* pga. den forkortede leverings-tid.

Ved pensionsplanernes *salg* af aktier har de ifølge deres custody statement (…) fulgt markedsstan-darden, T+2 (efter 6. oktober 2014).

Ved pensionsplanernes *køb* af aktier har de imidlertid afveget fra markedsstandarden. Pensionspla-nerne har ifølge custody statements (…) erhvervet aktierne på dagen før ex-daten (dvs. på sidste mulige dag, hvor aktierne kunne erhverves inkl. udbytte), men med "forsinket" levering. Levering skete T+3 (selvom markedsstandarden var T+2) og dermed <u>dagen efter *record date*</u>. Pensionspla-nerne har derfor end ikke ifølge sine egne aftaler modtaget udbyttet direkte fra det udloddende sel-skab eller gennem egne sub-custodians. Det påståede udbytte er derimod blevet udbetalt til en sæl-ger, der var depotindehaver på *record date*, men som havde pligt til at videreføre udlodningen, da aktien jo ifølge pensionsplanerne var blevet solgt inkl. udbytte (før *ex date*).

Pensionsplanerne gør dermed gældende, at de har været ejere, selvom de ifølge custody statements ikke har været registreret som ejere på *record date*, da de har handlet på vilkår, der afveg fra mar-kedsstandarden. Det er et set-up, som i høj grad vil muliggøre svindel, da pensionsplanerne dermed – end ikke ifølge egne papirer – vil være registreret som ejere af aktien på *record date*, hvor virksom-heden noterer ejerne og udbetaler udbyttet. For pensionsplanerne hævder, at de får aktierne leveret *senere* – og med ret til det udbytte, deres sælger modtager.

Den i strid med markedsstandarden forlængede leveringsperiode giver i øvrigt yderligere arbejde og risiko for tab. Hvis pensionsplanerne havde fulgt markedsstandarden, sådan som de fejlagtigt i deres indlæg påstår de gjorde, ville man undgå en pengeoverførsel af udbyttet fra sælgeren af aktierne til pensionsplanerne. Og pensionsplanere ville også undgå at løbe den risiko, at aktiesælgeren ikke over-fører udbyttet til dem. I alle Shah-sagerne vælger man at løbe dette besvær og yderligere risiko uden, at man har givet nogen som helst legitim grund hertil.

### 5.7    Handlerne (og fortjenesten)

Pensionsplanerne har oplyst (…), at *"Fra 2015 og fremefter er handlerne foretaget ved brug af en algoritme-trader, hvor trusteen blot skulle godkende forslagene. Der forefindes derfor ikke dokumen-tation for indgåelse af disse handler."*, (…).

Denne forklaring er simpelthen for letkøbt. Selvfølgelig er der dokumentation for indgåelse af aktie-køb for flere milliarder kroner. Desuden findes der ikke nogen "algoritme-trader", som sørger for, at aktiekøb gennemføres efter fortløbende antal, eller som afhænger af, hvilken custodian pensionspla-nerne er tilknyttet. Det giver simpelthen ikke nogen mening. Hvis der findes en algoritme, som pen-sionsplanerne anvender, så må den alene være blevet anvendt til at sløre de påståede aktiehandlers manglende realitet.

### 5.8    Det er udokumenteret, at nettoudbytte og refusion ædes op af omkostninger

Pensionsplanerne har anført, at deres aktiver ved udgangen af året ikke oversteg $ 250.000 på grund af de høje transaktionsomkostninger, der er forbundet med Div-Arb-investeringsmulighederne (dvs. udbyttearbitrage) (…).

Henset til størrelsen af de påståede aktieinvesteringer må der virkelig have været tale om meget betydelige omkostninger forbundet med transaktionerne.

Der er dog ikke fremlagt dokumentation, herunder kontoudtog og fakturaer, for at pensionsplanen har afholdt omkostninger, der kan have nedbragt pensionsplanernes aktiver – inklusiv refusion og påstået modtaget nettoudbytte på store millionbeløb – til højst 250.000 USD, (…). Omkostningerne er i øvrigt ikke specificerede, ligesom der ikke er fremlagt dokumentation for, hvem der er betalt omkostninger til, hvilke ydelser omkostningerne dækker, eller hvilke kontraktuelle vilkår omkostningerne er omfattet af.

Yderligere giver det ikke mening, at pensionsplanerne skulle indvilge i at deltage i udbyttearbitrageinvesteringerne, hvis hele fortjenesten blev ædt op af omkostninger. *Selvfølgelig* havde pensionsplanerne haft en fortjeneste, hvis de faktisk havde deltaget i et komplekst aktiehandel-set-up.

Og så er der den lille, men ikke uvæsentlige, detalje, at alle pensionsplaner, som TVC Advokatfirma repræsenterer, har afvist at fremlægge egne bankkontoudtog, hvor man kan se bevægelser og saldi.

**5.9     Custody Agreement er ikke blevet overholdt**

Forholdet mellem den enkelte pensionsplan og dennes custodian fra Sologruppen har ifølge pensionsplanen været reguleret af en Custody agreement og/eller Terms and Conditions for Custody Services (…).

Det fremgår af punkt 5.1 i den fremlagte Custody Agreement (…), at pensionsplanerne ved indgåelsen af aftalen straks skulle overføre beløb til pensionsplanernes konto hos sin custodian ("Minimum Cash Balance") til sikkerhed for pensionsplanernes forpligtelser.

Sikkerhedsstillelsen var som udgangspunkt 500.000 euro. (…). I nogle tilfælde er sikkerhedskravet dog lavere, (…), hvor der alene var krav om 20.000 euro.

Vilkåret om et minimumsbeløb hos custodian fremgår af alle Custody Agreements og/eller Terms and Conditions for Custody Services.

Sikkerhedsstillelsen er i alle tilfælde urealistisk lav i forhold til custodians indeståelse for pensionsplanernes transaktioner på milliardbeløb.

Dertil kommer, at *ingen* af pensionsplanerne har overholdt vilkåret, (…). På (…) bekræftede pensionsplanerne således, at *ingen* af dem havde overført et sådant beløb til sin custodian (…).

Kravet om kapital udgør en sikkerhed for custodian, som selvfølgelig skal være til stede, *inden* der handles. Sikkerheden er nødvendig, fordi det *er* risici forbundet med handler. Når der henses til, at pensionsplanerne ikke har nogen egenkapital, er kravet om minimumskapital endnu mere relevant. Derfor har det klart formodningen imod sig, at der skulle være foretaget aktiehandler, før sikkerhedsstillelsen blev indbetalt.

Når pensionsplanerne direkte anfører, at vilkåret om minimumskapital hos custodian inden handler ikke er blevet opfyldt af nogen af planerne, viser det, at Custody Agreement ikke er blevet overholdt, men blot er indgået/underskrevet for syns skyld.

I (…) har pensionsplanerne anført, at der ikke gjaldt en klausul om minimumskapitalisering i tidlige depotaftaler, hvorfor *nogle af* pensionsplanerne havde realiseret gevinst nok til at efterkomme kravet uden indbetaling. Derigennem er vilkåret om minimumsbeløb ifølge pensionsplanerne blevet opfyldt ved modregning.

Det er udokumenteret og har formodningen klart imod sig. Det er i strid med de fremlagte custody statements (…), hvor det fremgår på første side af hvert custody statement (…), at *"Opening Cash Balance"* for pensionsplanerne i alle år er 0 kr. Dertil kommer, at der ifølge custody statement ikke genereres noget overskud hos custodian ved transaktionerne, hvilket fremgår af *"Total Cash Balance"* (…). Der fremgår således ikke nogen gevinster, som ville kunne anvendes til modregning. [Pensionsplan F] opnåede dog et overskud på 0,29 USD (…).

Det anførte strider jo også imod, at pensionsplanerne – godt nok udokumenteret som så mange andre af deres påstande – påstår, at deres gevinster er meget små pga. store omkostninger, jf. afsnit 5.8. De pensionsplaner, hvor kravet var 500.000 EUR, har et yderligere bevisproblem. Hvis de har så stor en formue, skal de indsende regnskab til de amerikanske skattemyndigheder, jf. støttebilaget, afsnit 1.3, hvilket jo gælder, når formuen er over 250.000 USD.

En tilsyneladende undtagelse til det manglende overskud er [Pensionsplan D], hvis konto hos Old Park Lane i 2014 blev krediteret cash payment/receipts for 927.100,27 USD. og debiteret 19.952,02 USD. Det er udokumenteret, hvad disse poster dækker over. Ved udgangen af 2014 var disse beløb tilsyneladende på kontoen hos Old Park Lane. Beløbene forsvinder dog fra 2014 til 2015, hvor [Pensionsplan D] anvendte en anden Shah-custodian, nemlig Solo Capital. Da det *både* er udokumenteret, hvor beløbet stammer fra, og hvor det blev af, kan det ikke tillægges nogen betydning. Dertil kommer, at indeståendet/gevinsten under alle omstændigheder fortsat er mindre end minimumsbeløbet på 500.000 euro hos Old Park Lane (…). Der ses således heller ikke her nogen gevinst, der giver mulighed for at bortse fra kravet om indbetaling.

Ifølge pensionsplanernes egen dokumentation, nemlig custody statements (…), oppebærer pensionsplanerne således ikke nogen gevinst, der kan anvendes til at opfylde vilkåret om minimumsbeløb ved modregning. Kontoen starter nemlig i 0, og der genereres ifølge custody statement ikke nogen gevinst/noget overskud.

**6.    SYSTEMATIKKEN VISER, AT DET HAR VÆRET EN SKRIVEBORDSØVELSE**

Skattestyrelsen har foretaget en undersøgelse af de refusionsanmodninger og påståede aktiebesiddelser, der stammer fra pensionsplaner repræsenteret af TVC Advokatfirma, som har anvendt custodians fra Solo-gruppen, og som har fremlagt oplysninger om køb af aktier (broker confirmations eller custody statement). Undersøgelsens resultater angår <u>alle</u> de pensionsplaner, hvor TVC Advokatfirma har indgivet klager på vegne af pensionsplanerne i løbet af 2018 – dog ikke [Pensionsplan G], der har anvendt en anden custodian.

Det viser sig, at alle transaktionerne er systematiseret i et omfang, som kun giver mening, hvis der er tale om centralt orkestrerede transaktioner, der ikke involverer aktier eller penge. Så systematiserede transaktioner ville nemlig <u>aldrig</u> kunne finde sted i virkeligheden. Pensionsplanernes påståede aktieinvesteringer har nemlig været nøje afstemt.

Systematikken, der uddybes i de følgende afsnit, dækker blandt andet over, at:

- Alle aktieposter anvendt til refusion på en given aktie er købt samme dag og for samme kurs (afsnit 6.1, nedenfor).
- Aktieposterne er systematiseret, så der aldrig er to pensionsplaner, der ejer det samme antal af en given aktie. For A.P. Møller Mærsk-aktierne i 2015 ses det endda, at aktiebesiddelserne (med enkelte huller) er "fortløbende", så hver pensionsplan ejer én aktie mere end den foregående (afsnit 6.2, nedenfor).
- Selvom aktieposterne har betydelige størrelser, lykkes det i <u>alle</u> tilfælde at købe, udlåne, kurssikre og sælge aktieposten samlet (afsnit 6.2, nedenfor).

- Pensionsplanernes investeringsprofiler ligner hinanden. Det er således de samme ak-tier, som hver af pensionsplanerne påstår at have ejet (afsnit 6.3, nedenfor).
- Ved de påståede handler i foråret 2014 har alle pensionsplaner angiveligt <u>købt</u> aktier fra samme broker, <u>solgt</u> aktier til samme broker, indgået <u>forward</u>-aftale med samme part og <u>udlånt</u> aktierne til samme part (afsnit 6.4, nedenfor).
- Pensionsplanerne afhænder angiveligt aktierne efter et fast mønster, der dog ændres over tid. F.eks. i 2014 sælger alle pensionsplanerne *enten* på én dag (f.eks. Coloplast-aktier i december) eller i løbet af en periode på fire dage (f.eks. Novozymes-aktier) (afsnit 6.5, nedenfor).
- Sanjay Shah, der er mistænkt som hovedbagmand i hele udbyttesagen, har kontrol-leret alle fire anvendte custodians, der har spillet en central rolle (afsnit 6.6 og 6.7, nedenfor).
- Credit Advices er nummereret fortløbende på tværs af custodians, der på papiret er uafhængige juridiske personer (afsnit 6.8, nedenfor). Også ved senere anmodninger om refusion (indsendt i 2017) ses samme nummersystem anvendt (afsnit 6.9, neden-for).

På trods af alle disse ligheder – og det forhold at pensionsplanerne har valgt samme advokat og ind-giver enslydende skrifter i klagesagerne – fastholder pensionsplanerne, at de ikke har noget med hinanden at gøre (afsnit 6.10, nedenfor).

Systematikken viser, at der umuligt kan være tale om faktiske aktiehandler. Systematikken er kun mulig, fordi der er tale om en bogføringsøvelse orkestreret centralt og uden hold i virkeligheden – hverken gennem pengestrømme eller aktiebesiddelser.

Endelig er der to pensionsplaner, der tilsyneladende har glemt at søge refusion på ca. 29,5 mio. kr. for deres påståede aktiebesiddelser, hvilket kun kan ske, fordi der *faktisk* ikke er foretaget aktiehand-ler (afsnit 6.11, nedenfor).

### 6.1     Alle pensionsplaner køber samme dag og til samme pris (nyt)

I <u>alle</u> tilfælde har pensionsplanerne erhvervet deres aktier dagen før Ex-datoen, dvs. sidste dag hvor aktien kunne erhverves inkl. retten til udbytte.

*Derudover* har pensionsplanerne betalt *nøjagtig* samme kurs for aktierne (vistnok markedets lukke-kurs den givne dag). Det gælder dog tilsyneladende ikke Chr. Hansen Holding-aktier og Coloplast-aktier i 2013 samt [Pensionsplan H's] køb af Coloplast-aktier i december 2014 (i alt 15 handler ud af ca. 1.400 handler).

For eksempel har 76 pensionsplaner ifølge deres custody statements (…) købt aktier i Novo Nordisk A/S den 19. marts 2015. Pensionsplanerne har hver købt mellem 5,7 millioner aktier og 7,1 millioner aktier (svarende til en købesum på mellem 1,96 mia. kr. og 2,44 mia. kr.). Alle aktierne blev erhvervet til samme kurs, nemlig 341,9 kr. pr. aktie (se også afsnit 4.1 og 6.1, ovenfor).

Selvom alle pensionsplaner gør gældende, at de har anvendt samme investeringsstrategi, og selvom det ikke er usædvanligt at anvende lukkekursen til aktiehandler, er det påfaldende, at pensionspla-nerne har haft så sammenfaldende handelsmønstre. Eksempelvis kræver det ganske meget arbejde at skaffe sig adgang til at købe aktieposter af så betydelig en størrelse for hver enkelt pensionsplan. Når man har en aftale med en eller flere sælgere, vil man ønske at lukke den så hurtig som muligt for at fastholde sælgeren. Og der er et voldsomt arbejde med at lukke 76 aktiekøb med en værdi pr. styk på ca. 2 mia. kr.

**6.2      Størrelsen på aktiebesiddelser er systematiseret**

For pensionsplanerne, der har købt de samme aktier den samme dag og til samme pris, er også aktieposternes størrelse systematiseret. Der er således <u>ingen</u> tilfælde, hvor to pensionsplaner har købt det *samme* antal aktier.

(…) viser, hvordan de påståede besiddelser er systematiseret på tværs af pensionsplanerne. Bilaget indeholder en række oversigter over det antal aktier, som pensionsplanerne i henhold til deres indsendte Credit Advices skulle have ejet over udbyttedagen. Oversigterne baserer sig på <u>samtlige</u> Credit Advices (…), som Skattestyrelsen har modtaget fra pensionsplaner, der anvendte Solo-gruppen, og som Skattestyrelsen har udbetalt udbytterefusion på baggrund af. Udover pensionsplanerne repræsenteret af TVC Advokatfirma indgår der således også andre amerikanske samt malaysiske pensionsplaner, hvis navn er blevet anonymiseret i bilaget.

Oversigterne er blevet sorteret efter det antal aktier, som pensionsplanerne i henhold til deres indsendte Credit Advices hver især skulle have ejet over udbyttedagen. Antallet af aktier er stigende fra top til bund.

Alle oversigterne illustrerer, at antallet af aktier har en direkte sammenhæng med, hvem der er custodian for pensionsplanerne. Systemet fungerer således, at der er 3 intervaller, som antallet af aktier bogføres efter. Det mindste interval er styret af West Point og Telesto, det største interval er styret af Solo Capital, og intervallet i midten er styret af Old Park Lane.

Oversigten i (…) (Mærsk A-aktier), illustrerer eksempelvis, at West Point og Telesto styrer bogføringen i intervallet 7.717 – 8.193. Oversigten viser antallet af Mærsk A-aktier, som pensionsplanerne påstod at være i besiddelse af over udbyttedagen den 31. marts 2015 i henhold til deres Credit Advices. Blandt pensionsplanerne findes bl.a. [Pensionsplan F], [Pensionsplan C] og [Pensionsplan B], der alle er førersager. Deres trustees, som efter sigende *"afgiver samtlige ordrer til samtlige transaktioner"* (…), og som ikke havde *"nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner"* (…), er henholdsvis (…), (…) og (…).

Som det fremgår (…) er der ingen overlap mellem antallet af aktier, som pensionsplanerne påstår at være i besiddelse af over udbyttedagen. I oversigten over Mærsk A-aktierne (…) og Mærsk B-aktierne (…) er antallet af aktier endda fortløbende med kun enkelte "huller". Den tredje pensionsplan i rækken påstår i sin Credit Advice at have ejet 7.840 Mærsk A-aktier, den næste pensionsplan påstår at have ejet 7.841 Mærsk A-aktier, den næste igen 7.842 Mærsk A-aktier og så fremdeles.

Det giver ikke nogen som helst mening, at pensionsplaner, der ikke har noget kendskab til hinanden – og som efter sigende skulle styre deres egne påståede aktiehandler – skulle handle i sådant mønster. Det siger sig selv, at dette mønster ikke blot er et tilfælde.

Det fortløbende antal aktier var alene et røgslør, der havde til hensigt at skjule realiteterne for SKAT (nu Skattestyrelsen), nemlig at alle påståede køb af aktier er fiktive og alene udformet for uretmæssigt at opnå udbytterefusion.

_____

Det lykkes i *alle* tilfælde for pensionsplanerne at finde

- én sælger,
- én køber,
- én aktielåntager og